**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **TOTAL SAFETY U.S., INC.** | § | |
| **Plaintiff,** | § | |
| | § | **CIV. NO. 14-645** |
| **versus** | § | |
| | § | **JUDGE** |
| **24 HR SAFETY, LLC, AMY HAINS, AND** | § | |
| **TODD DARTEZ** | § | **MAGISTRATE JUDGE** |
| **Defendants.** | § | |

_____

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
_____

Plaintiff Total Safety U.S., Inc. ("Total Safety") respectfully files this Complaint for Damages and Injunctive Relief against 24 HR Safety, LLC, ("24 HR Safety"); Amy Hains ("Hains"); and Todd Dartez ("Dartez"), (collectively, "Defendants"), and avers as follows:

**PRELIMINARY STATEMENT**

1.

Total Safety brings this action against Defendants because they committed fraud and misappropriated trade secrets and other valuable business information—in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), the Computer Fraud and Abuse Act ("CFAA"), and various state laws. Since 2005, Defendants have conspired to steal—through numerous acts of wire and/or mail fraud—trade secrets and other valuable commercial information, including electronically-stored customer lists, business plans, financial models, and other highly confidential financial data from competitors in order to enable 24 HR Safety to increase its revenues, market share, access to capital, and operational capacities without investing the substantial time and money required to create this highly valuable information (the "Scheme").

2.

Defendants implemented the Scheme by unlawfully accessing the computer systems belonging to their competitors through the use of the Internet and, in other cases, soliciting their competitors' employees by phone and email to obtain and/or transmit electronically-stored business files and financial data to the Defendants.

3.

Total Safety has been a target of this Scheme—which is ongoing. Among other things, Defendants continue to utilize stolen intellectual property in 24 HR Safety's business operations and are attempting to conceal their Scheme from public scrutiny by hiding evidence from their computers/devices and other subterfuge.

4.

Defendants' recruitment of and association with Gary Rowland provides a prime example of how the Scheme operates.

5.

Total Safety employed Rowland as a regional manager until he abruptly resigned and began working for 24 HR Safety on October 7, 2013. Total Safety subsequently discovered in litigation against Rowland to enforce a non-competition agreement (the "Rowland Litigation") that, without authority or permission from Total Safety, Rowland downloaded over 200 files (containing highly valuable and competitively sensitive information belonging to Total Safety) from Total Safety's computer network and email exchange on to 7 portable flash drives at the direction of 24 HR Safety and its owners, Hains and Dartez.[1]

---

[1] The Rowland Litigation is ongoing in the Eastern District of Louisiana. *See Total Safety v. Rowland, et al.,* No. 13-6109 (E.D. La.) (Lemelle, J. presiding).

6.

Total Safety subsequently added 24 HR Safety as a party-defendant in the Rowland Litigation, and the Eastern District of Louisiana quickly ordered limited forensic electronic data examinations of, among others, Hains's and Dartez's computers, devices and email accounts. Those examinations revealed that Hains and Dartez—the owners of 24 HR Safety—have had unauthorized possession of highly confidential business files and financial data belonging to Total Safety and other business information belonging to at least one other competitor (Sprint Safety).

7.

They also revealed that Defendants are actively attempting to conceal evidence of the Scheme by using interstate communication devices and other methods. Before the results of the forensic examinations were known, Hains and Dartez also testified in depositions and (for Hains) in open court that they *never* had, *never* wanted, and *never* needed Total Safety's documents and information and were thus in compliance with an October 30, 2013, court order that compelled 24 HR Safety to "return any and all Total Safety information, documents, or property—whether electronic or hard copy—including but not limited to emails, flash drives, or any other external storage devices." The following excerpt of a fragmented file, identified during the forensic examination of Hains's devices, demonstrates that, contrary to their testimony, Defendants had possession of confidential Total Safety documents:

```
(((?@$@'(l@,D(D(D()"#12123*"#1212
"=*@ 'DD!D#D$D&D(+"#12123,"#12123-
'#12123."#12123/"#121230"#231"#232"#3456789:;<=>?Dl20w0e<me@,A,B,C,D,E,F,
G,H,I,J,K,L,M,N,O,P,Q,R,S,T,U,V,W,X,Y,Z,[,\,],^,_,@ABCDEFGHIJKLMNOPQRSTU
VWXYZ[\]^_Dl`,a,b,c,d,e,f,g,h,i,j,k,l,m,n,o,p,q,r,s,t,u,v,w,x,y,z,{`abcdefghijklmnopqrstu
wx
y
y
z
z{<`              {
                           (
*          (
h

S A??"?7]J`        `HMSPhotoEd.3.%>@<dA
@((!!##&&$$7     Sheet2
          0      LZng
dMbP?_*+%@=&R&8


&"Book Antiqua,Regular"Page &P of &N
Current as of &D&L&"Book Antiqua,Regular"&8This document is confidential and
legally priviledged; Access, disclosure, copying, distribution, or reliance on it's
content by anyone other than Total Safety U.S., Inc. is prohibited and may be a
criminal offense&?'?(?Mr\\lapfps01\LaPorte_LaserJet_5SC
odXLetterDINU"X&
XSMTJHHP LaserJet 5Si
MopierInputBinOption1RESDLLUniresDLLOrientationPORTRAITResolutionOption1Pap
erSizeLETTERMediaTypeAutoSelectCollateOFFEconomodeOption1RETOption1Halfto
neHT_PATSIZE_AUTODuplexNONEStaplingBogusOutputBinOption1"[X??U}
}
7}
```

8.

  Although the Eastern District of Louisiana ordered the return of all electronic documents belonging to Total Safety on October 30, 2013, Defendants withheld production of the fragmented files until May 2014. Two months later, in July 2014, Defendants produced fully viewable files belonging to Total Safety. These files included Total Safety's customer database and lists, business plans, financial models, and other highly confidential financial data. They also included business information belonging to another competitor, Sprint Safety.

9.

Total Safety promptly filed a motion for leave to amend its complaint after uncovering these facts. But 24 HR Safety and Rowland opposed the motion, arguing that adding new parties and claims that stemmed back to 2005 would unduly prejudice Rowland (since the case began against only *him* and initially concerned only *his* conduct) and that the amendment would be futile because venue was improper.

10.

The Eastern District of Louisiana found that "Total Safety has good cause to amend its complaint" because there was no evidence "to suggest that Total Safety knew or could have known about the files produced from Hains' laptop and email accounts." That is, Total Safety had no way of knowing what Hains, Dartez, and 24 HR Safety had been doing for the past decade. The Eastern District of Louisiana nevertheless ruled that venue was not proper in the Eastern District of Louisiana and that adding new claims, with facts extending back to 2005, would unduly prejudice Rowland's defense.

11.

Total Safety is thus following the Eastern District of Louisiana's ruling by filing this complaint in this district where venue is proper and where no party can claim "prejudice."

12.

Ultimately, Defendants' fraud and misappropriation of trade secrets has been highly effective, permitting 24 HR Safety to obtain start-up and operational capital, win contracts, develop customer relationships, increase revenue, and expand their operational capacities—all at the expense of their competitors. As part of the Scheme, Defendants have strategically targeted Total Safety on at least 4 occasions—in 2005, 2010, 2012, and 2013—and, on information and belief, have targeted other competitors during the same time period.

13.

Total Safety now seeks all damages that the Scheme has caused and all available equitable relief to prevent the threat of further harm.

## PARTIES

14.

Total Safety is incorporated under Delaware law and maintains its principal place of business in Houston, Texas, as well as facilities and extensive operations within this district.

15.

24 HR Safety, LLC, is organized under Texas law, maintains a principal operational facility in Ascension Parish, and is registered to do business in Louisiana. 24 HR Safety has two owners/members, one of whom is domiciled in Louisiana, making 24 HR Safety a Louisiana citizen.

16.

Hains is a Louisiana citizen, living in or near Lafayette. She is a former employee of Total Safety, is a current member of and Chief Executive Officer for 24 HR Safety, and regularly conducts business within this district.

17.

Dartez is a Texas citizen, living in or near Houston, Texas. He is a former employee of Total Safety, is a current member of and Chief Operating Officer for 24 HR Safety, and regularly conducts business within this district.

## JURISDICTION AND VENUE

18.

Jurisdiction is proper under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Total Safety's state law claims under 28 U.S.C. § 1367.

19.

Venue is proper under 28 U.S.C. § 1391 and 18 U.S.C. § 1965. Defendants transact business in this district, and many of the actions giving rise to Total Safety's claims occurred and/or have damaged Total Safety within this district.

## FACTS

### *TOTAL SAFETY AND ITS ACQUISITION OF WELL SAFE, INC.*

20.

Total Safety provides—on a global scale—integrated industrial safety solutions through a portfolio of safety services, personnel, and equipment to ensure that its customers' workers, facilities, and environments remain safe. Total Safety maintains a competitive edge in the market for safety services, personnel, and equipment through its ability to tailor its capabilities and solutions to its customers' specific business needs and operational dynamics.

21.

Total Safety has competed within the industrial safety industry since 1994 and has steadily expanded through quality service and strategic acquisitions. In 2004, Total Safety considered acquiring a competing company—Well Safe, Inc. ("WSI")—to acquire customer accounts and expand its operational efficiencies and reach.

22.

The WSI acquisition offered numerous commercial synergies to Total Safety. WSI and Total Safety had significant geographic overlap within Texas and the Gulf Coast region. Folding WSI into Total Safety would allow Total Safety to eliminate redundant geographical locations; combine duplicative rental and inventory assets; serve new customer accounts and contracts; and obtain access to skilled operational managers (like Dartez and Rowland); and corporate personnel (like Hains).

23.

On or about April 20, 2004, Total Safety acquired WSI for tens of millions of dollars through a Stock Purchase Agreement.

24.

Through this Stock Purchase Agreement, Total Safety became the sole owner of (among other things) WSI's trade secrets and confidential business information, including: ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, financial forecasting and budgeting processes and information, and business and marketing plans and proposals. That is, this information became Total Safety's property and comprised a substantial part of the acquisition price.

25.

Total Safety also acquired WSI's customer relationships and the employment agreements—both the burdens and benefits—for WSI employees who would work for Total Safety after the acquisition. This included Hains, Dartez, and Rowland.

### HAINS'S EMPLOYMENT WITH TOTAL SAFETY

26.

Hains was employed by WSI from September 1998 to April 2004 as its Comptroller. She was a high-level corporate employee who reported to WSI's President.

27.

As WSI's Comptroller, Hains's responsibilities included compiling accounting data for nine locations throughout Texas, Louisiana, Alabama, Alaska, and Florida; managing cash flows; preparing financial statements; managing capital expenditures; being an intermediary for accounting and managerial issues among locations; handling sales tax returns; being a liaison for

outside audits; supervising the accounting staff; preparing financial statement analyses and capital budgeting and forecasting; and maintaining accounting policies and procedures while ensuring internal controls in conjunction with Sarbanes-Oxley legislation.

28.

Hains also executed an employment agreement on November 15, 2003 (the "Hains Employment Agreement"). The Hains Employment Agreement states in pertinent part: "Employee [Hains] agrees to devote her full time, energy and ability to her duties hereunder. Any outside employment, consulting or any other active commercial business activity of any kind is strictly forbidden . . . ." It also states that "Employee [Hains] shall not at any time hereafter divulge or disclose to any person, firm, or company, or take or make use of any confidential or other information or trade secrets which constitute proprietary, special, or exclusive knowledge connected with the business, customers or operations of the Company or involving any of its dealings, transactions or affairs which she may acquire during the period of this Employment Agreement."

29.

The Hains Employment Agreement also contained a term provision: "The Company will employ the Employee, and the Employee agrees to remain in the employ of the Company, from the effective date of this Employment Agreement until August 31, 2005."

30.

In late 2003 and early 2004, Hains participated in the due diligence associated with WSI's divesture from its corporate parent, W-H Energy Services, which entailed compiling financial information and making presentations to potential buyers. Specifically, she was WSI's financial corporate employee who assisted with the due diligence concerning WSI's sale to Total Safety.

31.

Following the WSI sale, Hains became an employee of Total Safety, and both Total Safety and Hains remained bound by the Hains Employment Agreement—as specifically set forth in the Stock Purchase Agreement. Her title with Total Safety was Industrial Division Comptroller, and she continued to have access to Total Safety's confidential business information.

32.

As Total Safety's Industrial Division Comptroller, Hains's responsibilities included: compiling accounting data for all Industrial locations located throughout Texas, Louisiana, Alabama, Alaska, and Florida, inclusive of multi-location in-plant service centers; managing divisional cash flow; preparing preliminary financial statements; being an intermediary for accounting and managerial issues among locations; supervising Industrial accounting staff; preparing capital budgeting and forecasting; and maintaining divisional accounting policies and procedures while ensuring internal controls in accordance with GAAP.

33.

Hains was a high-ranking and highly trusted employee of Total Safety, who had access to Total Safety's confidential business information and  trade secrets, including, but not limited to: customer databases, contacts, and customer-specific financial information; Total Safety's pricing and historical sales information; Total Safety's revenues and profit margins; and Total Safety's financial strategies, capital expenditures, and budgetary estimates and forecasting.

34.

On August 19, 2004, Hains signed a Total Safety Employee Acknowledgment whereby she agreed to comply with Total Safety's employment policies.

35.

Total Safety's employee handbook includes a policy entitled "Confidentiality & Non-Disclosure of Co. Information" that defines confidential information and provides specific examples:

The protection of confidential information and trade secrets is vital to the interests and the success of the company.  Such confidential information includes, but is not limited to, the following examples:

*any formula, pattern, device, or compilation of information used in the business of companies which gives the companies an opportunity to obtain an advantage over competitors who do not know or use it.

*All materials, documents, or other information, whether in writing or in any other medium, designated as "confidential."  This includes but is not limited to pricing and operational standards.

**Note:  Information does not actually need to be marked confidential to be designed as confidential.  If employees have any questions as to whether or not something is confidential, they should <u>treat the information as confidential</u> until such time that the employee can confirm the status of the information with the Regional Manager, District Manager or President/Chief Operations Officers of their Division.**

| | | | |
|---|---|---|---|
| * compensation data | * computer processes | * computer programs and codes | * customer lists |
| * customer preferences | * financial information | * labor relations strategies | * marketing strategies |
| * new materials Research | * scientific data | * scientific formulae | * scientific prototypes |
| *technological data | * technological prototypes | * pending projects and proposals | * mergers & acquisitions |
| * proprietary production processes | | * research and development strategies | |

Employees who are exposed to confidential information may be required to sign a non-disclosure agreement as a condition of employment, or condition of continued employment. Employees who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, up to and including termination of employment and legal action, even if they do not actually benefit from the disclosed information.

36.

The employee handbook also includes a policy entitled "Computer and E-mail Usage"

that provides the following:

> Computers, computer files, the e-mail system, and software furnished to employees are the company property intended for business use. Employees should not use a password, access a file, or retrieve any stored communication without authorization. To ensure compliance with this policy, computer and e-mail usage is monitored. <u>There should be no expectation that any e-mail sent or received is private.</u>

> . . .

> E-mail may not be used to solicit others for commercial ventures, religious or political causes, outside organizations, or other non-business matters. <u>The company actively monitors e-mail transmissions coming into and going out of the computer system owned and operated by the company.</u>

> . . .

> **All employees should understand that upon termination from the company, for any reason, all email, contacts, calendars, and other data within the email software, and/or any other software program on an individual computer, are to be left in tack.** Whenever possible, the IT Department will lock-down the computer of an existing employee during the termination process, thereby ensuring the retrieval of any necessary business related documents and/or data.

37.

The employee handbook also includes a policy entitled "Return of Property" that

provides the following:

> Employees are responsible for all the company property, materials, or written information issued to them or in their possession or control.  Employees must return all the company property immediately upon request or upon termination of employment.   Where permitted by applicable law, the company may withhold from the employee's check or final paycheck the cost of any items that are not returned when required.  The company may also take all action deemed appropriate to recover or protect its property.

***DARTEZ'S EMPLOYMENT WITH TOTAL SAFETY***

38.

Like Hains, Dartez was a long-time employee of WSI. He began with WSI in 1989 and eventually became its Regional Manager, in charge of operations for WSI's facilities in Deer Park and Corpus Christi, Texas.

39.

Dartez executed an employment agreement on November 15, 2003, ("Dartez Employment Agreement"). The Dartez Employment Agreement states in pertinent part: "Employee [Dartez] agrees to devote his full time, energy and ability to his duties hereunder. Any outside employment, consulting or any other active commercial business activity of any kind is strictly forbidden . . . ." It also states that "Employee [Dartez] shall not at any time hereafter divulge or disclose to any person, firm, or company, or take or make use of any confidential or other information or trade secrets which constitute proprietary, special, or exclusive knowledge connected with the business, customers or operations of the Company or involving any of its dealings, transactions or affairs which he may acquire during the period of this Employment Agreement."

40.

The Dartez Employment Agreement also contained a term provision: "The Company will employ the Employee, and the Employee agrees to remain in the employ of the Company, from the effective date of this Employment Agreement until November 15, 2005."

41.

Following the sale, Dartez became an employee of Total Safety, and both Total Safety and Dartez remained bound by the Dartez Employment Agreement—as specifically set forth in

the Stock Purchase Agreement. He remained a Regional Manager with Total Safety and continued to have access to Total Safety's confidential business information.

42.

Like Hains, Dartez was bound by the same Total Safety policies set forth in Paragraphs 34-36 above.

### ROWLAND'S EMPLOYMENT WITH TOTAL SAFETY

43.

Like Hains and Dartez, Rowland was a long-time WSI employee. In 1989, he became a WSI employee and, like Dartez, worked as a Regional Manager. Rowland was responsible for WSI's facility in Gonzalez, Louisiana, including all operations and services WSI provided through that facility.

44.

Like Hains and Dartez, Rowland executed an employment agreement with WSI. It stated in pertinent part: "Employee [Rowland] agrees to devote his full time, energy and ability to his duties hereunder.  Any outside employment, consulting or any other active commercial business activity of any kind is strictly forbidden . . . ." It also states that "Employee [Rowland] shall not at any time hereafter divulge or disclose to any person, firm, or company, or take or make use of any confidential or other information or trade secrets which constitute proprietary, special, or exclusive knowledge connected with the business, customers or operations of the Company or involving any of its dealings, transactions or affairs which she may acquire during the period of this Employment Agreement."

45.

The employment agreement also contained a term provision: "The Company will employ the Employee, and the Employee agrees to remain in the employ of the Company, from the effective date of this Employment Agreement until November 15, 2005."

46.

Following the sale, Rowland became an employee of Total Safety, and both Total Safety and Rowland remained bound by the Rowland Employment Agreement—as specifically set forth in the Stock Purchase Agreement. He remained a Regional Manager with Total Safety and continued to have access to Total Safety's confidential business information.

47.

Like Hains and Dartez, Rowland agreed to be bound by the same Total Safety policies set forth in Paragraphs 34-36 above.

48.

Unlike Hains and Dartez (who each left Total Safety before their respective employment agreements expired), Rowland remained a Total Safety employee through the expiration date of the employment agreement that Total Safety acquired. In November 2005, Rowland therefore executed a new employment agreement with Total Safety (the "<u>Rowland Employment Agreement</u>") that replaced the previous employment agreement that Total Safety acquired. The Rowland Employment Agreement contained new non-competition, non-solicitation, and non-disclosure/confidentiality provisions.

### *ROGER STRICKLAND'S EMPLOYMENT WITH TOTAL SAFETY*

49.

Roger Strickland was also a WSI employee at the time Total Safety acquired that company. He was a sales manager, who worked from WSI's facility in Corpus Christi, Texas.

50.

Following the acquisition, Strickland became a Total Safety employee. Specifically, he was an Account Manager, who worked from Total Safety's facility in Corpus Christi, Texas.

51.

In 2006, Strickland agreed to participate in Total Safety's Account Manager Compensation Program and signed an agreement (the "Strickland Agreement") that set forth Total Safety's and Strickland's respective obligations. For his part, Strickland agreed to certain restrictive covenants, including an agreement not to use or disclose Total Safety's confidential information that he was given access to.

52.

Strickland agreed to participate in this program, and to be bound by the terms of the Strickland Agreement, until he resigned.

### JUSTIN ROWLAND'S EMPLOYMENT WITH TOTAL SAFETY

53.

Justin Rowland was also a WSI employee at the time Total Safety purchased the company. He worked under Rowland from WSI's facility in Gonzalez, Louisiana.

54.

Following the WSI acquisition, Justin Rowland continued to work for Total Safety at its facilities in Decatur, Alabama, and Gonzalez, Louisiana. He also continued to report to Rowland.

55.

Justin Rowland also agreed to comply with numerous policies that protected Total Safety's confidential business information and set forth Justin Rowland's obligations when using Total Safety's computing systems—including the policies set forth in Paragraphs 34-36.

### DEFENDANTS CONSPIRE AND MISAPPROPRIATE
### CONFIDENTIAL BUSINESS INFORMATION

56.

Unbeknownst to Total Safety, Defendants plotted to damage Total Safety (and later other competitors), and to strip the WSI acquisition from Total Safety, by stealing and using Total Safety's trade secrets and confidential business information to form and then operate what essentially would become a replicated WSI under the name "24 HR Safety." And, until now, they have largely succeeded. 24 HR Safety currently has facilities in Houston, Texas; Beaumont, Texas; Corpus Christi, Texas; Geismar, Louisiana; and (soon) Sulphur, Louisiana—the very same WSI locations that Total Safety acquired through the Stock Purchase Agreement in 2004; 24 HR Safety is significantly comprised of former WSI/Total Safety employees; and 24 HR Safety has targeted and continues to target the customer relationships that Total Safety acquired from WSI. This Scheme began in 2005 and has extended through the present and has targeted not only Total Safety but also other competitors.

### (The Scheme Commences: 2005 – 2009)

57.

In furtherance of the Scheme, on May 26, 2005, Hains emailed and/or mailed a resignation letter to Total Safety stating her last day of employment would be June 17, 2005. Around that same time, Dartez—who was Hains's boyfriend at the time—also resigned. Both the Hains Employment Agreement and the Dartez Employment Agreement remained in effect when they resigned.

58.

In furtherance of the Scheme, on June 1, 2005, Hains used an interstate communication device to access the Internet and connect to Total Safety's computer network to copy, without

authorization, Total Safety's customer database with over 9,000 customer names, contact information, customer balances, sales figures, credit amounts, balances due, profits, and other confidential business information. The information in this database represented a central component of Total Safety's business and was unknown to anyone outside Total Safety.

59.

In furtherance of the Scheme, Hains also used an interstate communication device in or around June 2005 to access the Internet and connect to Total Safety's computer network to copy, without authorization, Total Safety's 2005 budget and revenue forecast for Total Safety's Deer Park/LaPorte location. This budget and revenue forecast—which represented Total Safety's confidential business information and trade secrets—were used by 24 HR Safety to open a facility in the Deer Park/LaPorte area in direct competition with Total Safety.

60.

In fact, Hains created a "Checklist" by October 2005 for 24 HR Safety to use when forming 24 HR Safety and to track the various tasks assigned to each owner and person associated with 24 HR Safety. Within this "Checklist," Hains even attached portions of Total Safety's electronically-stored 2005 Capital Expenditure Budget, as well as WSI's electronically-stored 2003 Capital Expenditure Budget that Total Safety purchased. These documents belonged to Total Safety and contained its confidential business information and trade secrets.

61.

On information and belief, shortly before resigning, Dartez used an interstate communication device to access the Internet and connect to Total Safety's computer network to copy, without authorization and in violation of company policy, Total Safety's confidential business information. This included Total Safety's Capital Expenditure Budget and Authorization For Capital Expenditure for an essential piece of equipment in the industrial safety

industry—which contained Total Safety's revenue/expenditure analysis for the equipment. On information and belief, Dartez then emailed this electronically-stored information to Hains. Defendants used the trade secrets and confidential business information stolen from Total Safety to establish budgets and revenue forecasts for 24 HR Safety, establish pricing for 24 HR Safety, establish customer contacts for 24 HR Safety, establish sales and marketing strategies for 24 HR Safety, and develop target lists—all of which, in turn, permitted 24 HR Safety to solicit financing for operations, solicit customers, and capture market share. These activities were dependent on and undertaken with the use of phones and internet communication devices.

62.

In short, the entire business operations of 24 HR Safety originated with confidential business information and trade secrets misappropriated from Total Safety. By stealing the trade secrets and confidential information from Total Safety, Defendants obtained access to competitive strategies that they would never have been able to develop on their own and avoided the time delays and costs associated with developing their own business strategies. At a minimum, this permitted Defendants to enter the market and capture market share from Total Safety months, if not years, earlier than they could have without access to Total Safety's trade secrets and confidential information.

**(The Scheme Continues: 2010 – 2011)**

63.

Defendants utilized the trade secrets and confidential information stolen from Total Safety in 2005 in the establishment and operation of 24 HR Safety and to compete with Total Safety throughout the period 2005-2009. In early 2010, Defendants continued with their pattern of racketeering activity. They solicited (by telephone and/or email) a former Total Safety

employee—Roger Strickland—to disclose additional trade secrets and confidential business information to use in their business operations.

64.

Strickland was contractually bound to refrain from using or disclosing Total Safety's confidential business information, but shortly before resigning from Total Safety, Strickland used an Internet communication device to connect to Total Safety's computer network to steal Total Safety's electronically-stored confidential business information.

65.

In or around February 2010, Hains and 24 HR Safety solicited Strickland to disclose Total Safety's confidential business information to 24 HR Safety through email communications.

66.

On February 3, 2010, Strickland sent Hains an email, attaching Total Safety's confidential business information, including: Total Safety's business plan for a specific customer; Total Safety's pricing worksheet/budget estimate for a specific customer; Total Safety's sales quotes, Total Safety's rate sheets for certain services; Total Safety's pricing for a specific customer; and Total Safety's client information.

67.

Strickland also emailed business information belonging to another competitor, Sprint Safety.

68.

Hains knew that this information was confidential, that it was fraudulently obtained, and that it should not be used to unlawfully compete.

69.

In fact, some of the Total Safety documents and information even contained the following warning about the *potential criminality* of using or disclosing the documents and information:

> **This document is confidential and legally privileged. Access, disclosure, copying, distribution, or reliance on its content by anyone other than Total Safety U.S., Inc. is prohibited and may be a criminal offense.**

70.

Without hesitation, Hains forwarded the email (and its attached confidential documents) to Dartez nine minutes after receiving it:

**From:** Roger Strickland [mailto:roger@24hr-safety.com]
**Sent:** Wednesday, February 03, 2010 3:13 PM
**To:** 'Amy Hains'; sbreazeale@24hr-safety.com
**Cc:** 'Justin Lytle'
**Subject:**

I hope this will help, please let me know if you have any questions.

| | |
|---|---|
| **From:** | Amy Hains <amy@24hr-safety.com> |
| **Sent:** | Wednesday, February 03, 2010 3:22 PM |
| **To:** | 'Todd Dartez' |
| **Subject:** | FW: |
| **Attachments:** | 2008 HFR Fire - Field Service Rates - Rev 1 11-26-07.pdf; 2008 proposal formosa11142007#2.doc; Citgo BreathingAir Quote 1.doc; CITGO PLAN.doc; Copy of Budgetary Estimate v11.xls; Current Price List (Sprint Safety) 2009.xlsx; Doc1bid sheet.doc; Lyondell Corpus Christi.rtf; Quote Template.doc |

71.

On information and belief, 24 HR Safety then used this confidential business information to unlawfully compete against Total Safety.  As a result of receiving/using this information, 24

HR Safety improperly generated revenue and received income that was used to expand 24 HR Safety's operations and market share.

72.

For instance, Strickland obtained and disclosed Total Safety's price quoting tool that contained Total Safety's confidential pricing formula. Within a few months, Hains and a 24 HR Safety employee Tony Aube (who was also a former WSI/Total Safety employee) developed a bid quote for a job that would generate several hundred thousand dollars in revenue. Hains and Aube's quote used the exact price quoting tool that Strickland provided—and it even included a specific comparison between 24 HR Safety's bid quote and Total Safety's bid quote.

73.

On information and belief, 24 HR Safety and its employees have used Total Safety's price quoting tool—as well as other competitor's proprietary information—to compete unfairly for work from other customers. That is, this was not an isolated occurrence.

74.

Strickland is currently employed by 24 HR Safety and continues to service the same customers that the stolen information and documents concerned.

**(The Scheme Still Continues: 2012)**

75.

On information and belief, in early 2012, Dartez participated in the theft of confidential business information by encouraging an unknown Total Safety employee to misappropriate Total Safety's confidential business information for his and 24 HR Safety's benefit in early 2012.

76.

On or about January 10, 2012, Dartez received an electronically-stored copy of Total Safety's confidential customer/revenue list for its Louisiana customers. The customer/revenue

list contained Total Safety's confidential business information relating to over 200 customers in Louisiana.

77.

On January 10, 2012, Dartez forwarded Total Safety's Louisiana customer/revenue list to Hains:

| | |
|---|---|
| **From:** | Todd Dartez <todd@24hr-safety.com> |
| **Sent:** | Tuesday, January 10, 2012 11:36 AM |
| **To:** | 'Amy Hains' |
| **Subject:** | Total Safety -Customer list Louisiana |
| **Attachments:** | TS LA ACCOUNTS FEBRUARY 2011 REVENUE BY CUSTOMER 2011..xls |

Since I owe you one, here's a list of your competitor's Louisiana accounts that may help☺

78.

Two minutes after receiving the email and customer list from Dartez, Hains calls Total Safety's confidential business information a "pot of gold":

| | |
|---|---|
| **From:** | Amy Hains <amy@24hr-safety.com> |
| **Sent:** | Tuesday, January 10, 2012 11:38 AM |
| **To:** | Todd Dartez |
| **Subject:** | Re: Total Safety -Customer list Louisiana |

Wow.  Where did this pot of gold come from?

Thanks -
Amy

79.

After receiving the Total Safety customer/revenue list relating to its Louisiana customers, 24 HR Safety began recruiting a current Total Safety employee, Mickey Bercegeay, to open a Louisiana office for 24 HR Safety.

80.

Bercegeay was hired by 24 HR Safety, and 24 HR Safety opened a facility in Geismar, Louisiana in or around May 2012.

81.

On information and belief, 24 HR Safety used Total Safety's Louisiana customer/revenue list and other confidential business information to set prices, establish profit margins, target customers, and establish sales and marketing plans, etc.

**(Decade-Long Scheme Uncovered: 2013-2014)**

82.

The Scheme continued through 2013 and was finally uncovered in July 2014. In 2013, Rowland was the latest culprit to misappropriate Total Safety's trade secrets and confidential business information in order to compete unfairly. But it wasn't until July 2014 that—after failing for eight months to comply with a court order to return Total Safety's information—24 HR Safety finally provided Total Safety with sufficient evidence to discover that Rowland's theft was only the tip of the iceberg and that Defendants had engaged in this conspiratorial Scheme since its inception in 2005.

83.

Though Rowland worked with Hains and Dartez at WSI for several years before the acquisition (and for a year at Total Safety after the acquisition), he remained with Total Safety for nine years. Specifically, he was Total Safety's Region Manager for Region 4—a territory that includes all the territory between Lafayette, Louisiana and Pensacola, Florida, bounded on the north by Shreveport, Louisiana and the south by the Gulf of Mexico, and including Total Safety's offices in the Louisiana cities of Gonzalez, Baton Rouge, and New Orleans and the Alabama cities of Mobile and Decatur.

84.

Rowland acquired a keen understanding and extensive access to Total Safety's confidential business information and trade secrets, especially with respect to its business interests and client relationships. The client relationships that Total Safety paid Rowland to build accounted for tens of millions of dollars in revenue.

85.

Rowland agreed that he "shall use the Confidential Information only as necessary and only in connection with the performance of his duties" as a Regional Manager for Total Safety and that he "shall not disclose to any unauthorized person or use for his own purpose or any other purpose . . . any Confidential Information without the prior written consent of the Board." He also agreed to return Total Safety's property and confidential business information when his employment relationship with Total Safety ended.

86.

By July 2013, Rowland began to seriously negotiate employment with 24 HR Safety while he was still Total Safety's Region 4 Manager. He also began to negotiate employment with 24 HR Safety for another Total Safety employee, Justin Rowland.

87.

Rowland's discussions with 24 HR Safety continued through September 2013.  During this time, Rowland shared confidential information with Hains and 24 HR Safety.  Specifically, he provided them with a confidential LLC agreement through which Total Safety's parent company operates.

88.

By September 12, 2013, Rowland had secured employment for himself and Justin Rowland, and he received an official offer letter from 24 HR Safety on that date. Rowland was

offered the position of Eastern Regional Manager with the responsibility of overseeing 24 HR Safety's operations within Louisiana, including the designated parishes in the Rowland Employment Agreement.

89.

At this point, Rowland began to take actions as an agent and on behalf of 24 HR Safety, and Rowland and 24 HR Safety entered into an indemnity agreement, through which 24 HR Safety agreed to pay for his legal defense and any damages caused by Rowland's leaving Total Safety and working for 24 HR Safety.

90.

On or around September 11, 2013, Rowland began to connect to Total Safety's computing network and email exchange and to download files containing Total Safety's most valuable confidential business information and trade secrets on to portable flash drives. Rowland also began emailing information and secrets to his private email account from his Total Safety email account. Rowland was not authorized to do so.

91.

By October 6, 2013, Rowland had downloaded over 200 files containing Total Safety's confidential business information on to at least 7 portable flash drives.  The following chart lists the files that Rowland downloaded on to the flash drives:[2]

| USB FLASH DRIVE #1 | |
|---|---|
| FILE NAME | FILE TYPE |
| Wk_Ending_070613 | Excel Spreadsheet |
| WE 07.12 Reg 4 | Excel Spreadsheet |
| Turnaround Estimate Worksheet – ██████████ 2013 ████████ TA | Excel Spreadsheet |
| TTM Dtl Stmt of OPS by Month-Region 4 | Excel Spreadsheet |
| TS-HSE-F009 Driver Observation Checklist 2 part | PDF |

---

[2] Any information that identifies a Total Safety customer has been redacted.

| | |
|---|---|
| NCR | |
| Total Safety Marathon 2013 TA Rates – 7-1-13 | Excel Spreadsheet |
| Total Safety Facility Evaluation VMR 120612 (2) | Excel Spreadsheet |
| Total Safety Facility Evaluation ver 2.3 | Excel Spreadsheet |
| TAR Best Practices Training_Rev1_full | Power Point |
| Safety_WIG_Metrics_Rev1 | Excel Spreadsheet |
| Root Cause Analysis Presentation | Zip/Power Point |
| Region 4 Training Gaps master use | Excel Spreadsheet |
| Region 4 Safety WIG Scorecard 07-07-13 | Excel Spreadsheet |
| Region 4 Revenue Bridge | Excel Spreadsheet |
| Region 4 BAC with PY and Expanded Materials | Excel Spreadsheet |
| Region 4 BAC with PY and Expanded Materials (10) | Excel Spreadsheet |
| R4 2013 budget recover plan 1.2 | Excel Spreadsheet |
| R4 Expense Detail JUL 2013 FINAL | Excel Spreadsheet |
| Pricing Analysis worksheet | Excel Spreadsheet |
| MASTER General Slide Template | Power Point |
| ████ Start Up Sheet | Excel Spreadsheet |
| ████ EA2 2013 TA START UP SHEET | Word |
| ████ START UP SHEET | Word |
| Copy of R4 – September | Excel Spreadsheet |
| Copy of ████ Pricing Analysis | Excel Spreadsheet |
| Copy of ████ 2013 Phenol Budgetary estimate xls | Excel Spreadsheet |
| Commercial Motor Vehicle Spot Check | PDF |
| Causemaptemplate | Excel Spreadsheet |
| August Overtime Billable and Non 2013 | Excel Spreadsheet |
| August 2013 – Perdiem Mileage Hotels Billable and Nonbillable – Main Spreadsheet | Excel Spreadsheet |
| Asset Mgmt WIG Scorecard thru 2013-06 | Excel Spreadsheet |
| Air Cobra Manual | PDF |
| 2014 Business Outline | Word |
| 20130711143354712 | PDF |
| 2013 Midyear review | Word |
| 2013 ████ EAII III September 2013 – total safety (2) | Excel Spreadsheet |
| 2010 Site Facility Inspection Checklist final 08-04-10 | Excel Spreadsheet |
| 06-2013 – KPI – Days Inventory on Hand by Location | Excel Spreadsheet |
| **USB FLASH DRIVE #2** | |
| **FILE NAME** | **FILE TYPE** |
| 2014 TAR Schedule | Excel Spreadsheet |
| **USB FLASH DRIVE #3** | |

| FILE NAME | FILE TYPE |
|---|---|
| Chalmette 3 | TIF |
| Chalmette 2 | TIF |
| Chalmette 1 | TIF |
| Chain of Emails | PDF |
| Centralized Confined Space Monitoring System RULES OF ENGAGEMENT 08.22.12 | PDF |
| Centralized Confined Space Monitoring System RATE DOCUMENT 08.21.12 | PDF |
| BTR Customer Data | Excel Spreadsheet |
| BRE Customer Data | Excel Spreadsheet |
| ███   Pricing Analysis | Excel Spreadsheet |
| August Overtime Billable and Non 2013 | Excel Spreadsheet |
| Agreement A2074772, Amendment 009 February 24, 2010 | PDF |
| A2074772 – Total Safety – Exhibit D1 – Downstream – September 2009 | PDF |
| 9.11.2013 TAR Daily Report ███████ | Excel Spreadsheet |
| 9.11.2013 TAR Daily Report ███████ POX13106 OFFSHORE RIG | Excel Spreadsheet |
| 2014 Budget Planning Guide | Word |
| 2014 Budget Business Plan Outline | Word |
| 2014 Budget Assumptions | Word |
| 2013 Targets Update – Jan 2013 | Excel Spreadsheet |
| 2013 GBRIA Safety Award Nomination Packet BG | Word |
| 2012115091136295 | PDF |
| 2012115091122717 | PDF |
| 2012115091109239 | PDF |
| 2012115091055187 | PDF |
| 2012115091041378 | PDF |
| 2012115090535483 | PDF |
| 2012115090502182 | PDF |
| 2012115090447109 | PDF |
| 2012115090433813 | PDF |
| 2012115090420110 | PDF |
| 2012 1st Quarter TA's Region 4 (BTR) | Excel Spreadsheet |
| 2012 1st Quarter TA's for region 4 DEC & MOB | Excel Spreadsheet |
| 2011-Labor Transfer-Burden Calc (5 17 2011) | Excel Spreadsheet |
| ███   Customer Data | Excel Spreadsheet |
| ███   template operations 2013 | Word |
| Job Safety Analysis – HSE-470 – Draft 00 | Word |
| ███ Start Up Sheet ██████ USF 2013 | Excel Spreadsheet |
| Interviewing Don'ts | Word |
| Interview Record | Excel Spreadsheet |

| | |
|---|---|
| INSTRUMENT REPAIR STATUS REPORT 09.11.13 | Excel Spreadsheet |
| Instructor Checklist H2S (2012) | Word |
| Initial Proposal for Equipment and Cost Comparison | Word |
| Hand Tools Hand Safety | PDF |
| H2S-SO2 PELs | Word |
| H2S Training Outline (Tsus 2012) | Word |
| H2S Student Exam-HS001 | Word |
| H2S Safety Roster | Word |
| H2S Safety (TSUS-2011) | Power Point |
| H2S Safety (2 hr) | Power Point |
| Gary Rowland Blank Expense Report | Excel Spreadsheet |
| Fw PO for Total Safety | Outlook Email |
| Five Year Service Agreement – Analysis 070610-1 | Excel Spreadsheet |
| Fit Test-Med Eval Roster | PDF |
| EXC Customer Data | Excel Spreadsheet |
| Employee of the Month guidelines final draft (2) | Word |
| Employee of the Month Ballot | Excel Spreadsheet |
| ████ TAR Report 9.7.13 | Excel Spreadsheet |
| ████ Billable and Non August 2013 | Excel Spreadsheet |
| DEC Customer Data | Excel Spreadsheet |
| Daily TA Report- w Changes v02 | Excel Spreadsheet |
| Cost Savings Region 4 | Excel Spreadsheet |
| Copy of R4 – September | Excel Spreadsheet |
| Children – 360 Degree Walk Around | PDF |
| ████ Proposal 02 01 10 | PDF |
| ██ TA Billing ███ RC | Excel Spreadsheet |
| ██ Customer Data | Excel Spreadsheet |
| ██ Billing Root Cause Analysis | Word |
| ██ Customer Data | Excel Spreadsheet |
| ████ Mid-Year Review 2012 | Power Point |
| ████ MSA rates only 04 20 12 | PDF |
| ████ – Industrial Safety Services Proposal GONKB070710 | Word |
| Turnaround Startup ████████ 9 TA – October 2010 | Word |
| Turnaround Startup ██████ TA – September 2010 | Word |
| Turnaround Estimate Worksheet – ████ #9 October 2010 | Excel Spreadsheet |
| Turnaround Estimate Worksheet – ████ September 2010 | Excel Spreadsheet |
| TTM Dtl Stmt of OPS by Month-Region 4 | Excel Spreadsheet |

| | |
|---|---|
| TS-HSE-F054 – Job Safety Analysis Form – Original – Front Side | Word |
| TS-HSE-F054 – Job Safety Analysis Form – Original – Back Side | Word |
| TS-HSE-324%20-%20Management%20of%20Change%20-%20Original | PDF |
| TS-HSE-1005 – Vehicle Walk Around and Parking Guidelines Revo1 | PDF |
| Total Safety. ████ Labor Rates 3.2013 | Excel Spreadsheet |
| Total Safety Turnaround Equipment Rates March 2013 | Excel Spreadsheet |
| Total Safety JSA | Excel Spreadsheet |
| Total Safety JSA Office | Excel Spreadsheet |
| Total Safety Facility Evaluation ver 2.3 | Excel Spreadsheet |
| Total Safety Amendment 3 Final (6) | Word |
| Total Safety – Near Miss Reporting | Power Point |
| TA Organizational Chart | Excel Spreadsheet |
| TA Estimates (2 excel spreadsheet attachments in email: Turnaround Estimate Worksheet – VSC ████ Estimate 1.19.12; Turnaround Estimate Worksheet – VSC ████ Estimate 1.26.12 | Outlook Email |
| SWOT_analysis – 10.18.13 | Word |
| Respiratory Prot-SCBA Roster | Word |
| Request for hire form | Word |
| Request for hire (Region 4) | Word |
| Region 4 Revenue Bridge | Excel Spreadsheet |
| Region 4 Org Chart current | PDF |
| Region 4 Employee Nomination Form | Word |
| Region 4 BAC with PY and Expanded Materials | Excel Spreadsheet |
| Region 4 – 1-23-12 | Excel Spreadsheet |
| R4 Forecast – August | Excel Spreadsheet |
| Processing of New Hires Region 4 | Word |
| PHA Customer Data | Excel Spreadsheet |
| Perdiem, Mileage, Hotels Billable and Nonbillable- Main Spreadsheet 2013 | Excel Spreadsheet |
| Offer letter Template TPT Hrly eff 121712 | Word |
| Offer letter Template FT Hrly eff 121712 | Word |
| Near Miss Reporting Card | PDF |
| Monthly Regional Commentary | Word |
| Modifications to ████ proposal (1 PDF attachment: ████ April 2013) | Outlook Email |
| **USB FLASH DRIVE #4** | |

| FILE NAME | FILE TYPE |
|---|---|
| Pricing Analysis worksheet | Excel Spreadsheet |
| Instrument Repair Status Report 09.26.13 | Excel Spreadsheet |
| **USB FLASH DRIVE #5** | |
| **FILE NAME** | **FILE TYPE** |
| MASTER General Slide Template | Power Point |
| Copy of Region 4 Revenue Detail – All locations 9-20-13 | Excel Spreadsheet |
| **USB FLASH DRIVE #6** | |
| **FILE NAME** | **FILE TYPE** |
| 2012 Power Point Template | Power Point |
| **USB FLASH DRIVE #7** | |
| **FILE NAME** | **FILE TYPE** |
| R4 – Location Business Mix YOY | Excel Spreadsheet |
| Region 4 2012 Mgr Meeting – Copy | Power Point |
| Copy of 2011-Labor Transfer-Burden Calc (5.17.2011) | Excel Spreadsheet |

92.

In the Rowland Litigation, Total Safety's COO explained the value and competitively sensitive nature of these files and the information contained within them.

93.

The only reason Rowland downloaded these files—from the time he negotiated and then secured employment with 24 HR Safety and continuing through his resignation on October 6, 2013—was to take Total Safety's confidential business information for 24 HR Safety's use when competing against Total Safety and in the marketplace.

94.

Additionally, and without authorization, Rowland used a specialized software program on his Total Safety computer to scrub it clean of evidence demonstrating what he downloaded and took.  He also tried to delete all emails from his Total Safety email account to his personal email that contained Total Safety's confidential information and trade secrets.

95.

On October 6, 2013—a Sunday night—Rowland sent Total Safety a resignation letter, in which he specifically noted that "he left the company Computer, (password to log into to [sic] is Resetpassword!), Shirts, Credit Card, (Note as soon as I receive my final expense check attached, I will pay the remaining balance on the card), Office Keys, Site Badges and etc are [sic] in the Gonzales office."

96.

Although Hains drafted this letter for Rowland, he added the note regarding the return of Total Safety's property to give the impression that he had returned all of Total Safety's property to Total Safety.

97.

On October 8, 2013, Total Safety's CEO and COO met with Rowland in an effort to convince him to stay with Total Safety.[3]  Rowland, however, informed them that he had already accepted a position with 24 HR Safety and had made a commitment to that company, and during the meeting, Rowland went out of his way to ensure them that he had returned all of Total Safety's property once he resigned.

98.

Rowland did not return the flash drives containing Total Safety's confidential business information until the Eastern District of Louisiana issued the first temporary restraining order and after Total Safety demanded that he immediately return any Total Safety property that he had retained.

---

[3] This is before Total Safety learned that Rowland misappropriated its confidential and proprietary information. Total Safety did not learn of Rowland's theft until after the initial temporary restraining order was entered and the thumb drives were returned by Rowland's counsel.

99.

But he also retained important information within his personal email account—even after returning the flash drives. In fact, on October 15, 2013, and as 24 HR Safety's high-ranking manager, Rowland emailed Total Safety's confidential business information from his Yahoo! account to his iCloud account—in direct violation of the Eastern District of Louisiana's temporary restraining order. On December 16, 2013, the Eastern District of Louisiana not only entered a preliminary injunction prohibiting Rowland from using or disclosing Total Safety's information but also held Rowland in contempt for retaining and continuing to access Total Safety's confidential business information.

100.

Additionally, through forensics conducted after Total Safety filed its suit against Rowland, Total Safety also discovered that Justin Rowland used the internet to download and copy Total Safety's confidential business information to one or more flash drives. Specifically, on or around October 2, 2013, he accessed—from an external storage device—several Total Safety files that contained highly confidential business information. On information and belief, Justin Rowland downloaded the files to that external storage device on or around October 2, 2013.

101.

Justin Rowland resigned from Total Safety on October 7, 2013—with no notice—and went to work for 24 HR Safety. Before leaving Total Safety's office, he signed an acknowledgment that he returned Total Safety's property , including all three of his "Turnaround Best Practices  books," keys, truck keys, uniforms, and MasterCard.

102.

Justin Rowland did not return the external storage device(s) that contained Total Safety's confidential business information that he accessed on October 2, 2013.

103.

On information and belief, Justin Rowland and 24 HR Safety still have access to this external storage device(s) and/or the information that was on the external storage device.

### DEFENDANTS TRIED TO HIDE THEIR DECADE-LONG SCHEME

104.

After Total Safety discovered that Rowland had stolen its trade secrets, Hains and Dartez tried to hide their nearly decade-long Scheme.

105.

Hains and Dartez testified at their depositions, and Hains testified on the stand, that they and 24 HR Safety *never* wanted, *never* needed, and *never* took Total Safety's information.

106.

As set forth above in Paragraphs 55-80, the forensic examination of Hains's devices revealed that Defendants have an insatiable appetite for Total Safety's information.

107.

The forensic examinations also indicate that Hains and Dartez took steps to impede what could be uncovered through the forensic examinations. The forensic examination of Hains's

iPhone also demonstrated an utter disrespect for the federal judiciary and, in particular, the Eastern District of Louisiana—which further evidences the Defendants' contemptuous attempt to conceal their Scheme.

**COUNT I**
**CIVIL RICO—18 U.S.C. § 1962(a)**

**(Against Defendants)**

Total Safety realleges and incorporates all allegations set forth herein.

108.

Hains and Dartez are each a person within the meaning of 18 U.S.C. § 1961(3) and 1964(c). 24 HR Safety is an enterprise within the meaning of 18 U.S.C. § 1961(4) and 1962(a), engaged in activities that are in and affect interstate commerce.

109.

Defendants have been using and investing, directly and indirectly, income in the establishment and operation of 24 HR Safety which was received by them and derived, directly or indirectly, from a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5), and 1962(a), namely, and as more fully described above and below, multiple related instances of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

110.

Specifically, Defendants received income derived directly or indirectly from their theft of electronically-stored trade secrets and business information from competitors, including Total Safety (the particular instances are set forth above in Paragraphs 55-106). Defendants then used this income to establish and expand 24 HR Safety's operational scope and market share within the interstate industrial safety industry to compete against Total Safety. Specifically, 24 HR Safety used this income to launch in Deer Park, Texas, expand to Corpus Christi, Texas, then to

Beaumont, Texas, then to Geismar, Louisiana, and then to a soon-to-open-facility in Sulphur, Louisiana. Unless stopped, Defendants will continue to steal and utilize trade secrets and confidential information from competitors in their business operations and use unlawfully obtained income to further expand 24 HR Safety's operations, profits, business opportunities, and market share.

111.

Total Safety has been damaged through the use and reinvestment of this income into 24 HR Safety's operations. Specifically, this use and reinvestment has allowed 24 HR Safety to grow rapidly and become a formidable competitor within the same industry footprint previously occupied by WSI (and that Total Safety paid tens of millions of dollars to acquire). Total Safety has been damaged by being substantially deprived of its multi-million-dollar acquisition of WSI, as well as profits, business opportunities, and market share that 24 HR Safety has been able to garner through its expanded operations funded by this unlawfully obtained income. Total Safety is thus entitled to all damages caused by the Defendants violation of 18 U.S.C. 1962(a), treble damages, attorneys' fees and costs, and all equitable relief this Court deems necessary.

112.

Additionally, Total Safety did not learn, and could not have known, about the Defendants' misconduct until July 2014, since Defendants intentionally concealed their misconduct from Total Safety until that date.

## COUNT II
## CIVIL RICO—18 U.S.C. § 1962(c)

### (Against Hains and Dartez)

Total Safety realleges and incorporates all allegations set forth herein.

**The RICO Persons**

113.

Hains and Dartez are each a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c). 24 HR Safety is an enterprise within the meaning of 18 U.S.C. § 1961(4) and 1962(a) and has, at all relevant times, been engaged in activities that are in and affect interstate commerce.

114.

Hains and Dartez were founders, officers and/or member-owners of 24 HR Safety at all relevant times, and controlled the management, operations, and finances for 24 HR Safety.

115.

Hains and Dartez directly conducted and participated in the conduct of the affairs of 24 HR Safety through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5), and 1962(a), namely, and as more fully describe above and below, multiple related instances of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. In furtherance of the Scheme, Hains and Dartez have utilized the resources of 24 HR Safety to carry out their pattern of racketeering activity.

**Particular Instances of Racketeering and Fraudulent Activity**

116.

Hains and Dartez violated 18 U.S.C. § 1962(c) by conducting and participating in the Enterprise's Scheme to defraud Defendants' competitors and specifically targeted Total Safety.

117.

In furtherance of the Scheme, Hains and Dartez committed multiple acts of mail fraud and wire fraud that constitute predicate acts under RICO. Among other things, on or around June 2005, under the guise that they were performing job duties for Total Safety, Hains and Dartez

used Internet communication devices to fraudulently obtain, steal, share, and use Total Safety's electronically-stored confidential business information, including: a customer database that contains confidential information concerning over 9,000 customers; Total Safety's 2005 budget; Total Safety's financial analysis of revenue for 2001-2004; Total Safety's capital expenditure budget; Total Safety's bad debt analysis; and Total Safety's capital expenditure analysis for an essential piece of equipment within the industrial safety industry. These particular instances are set forth in more detail above in Paragraphs 55-61.

118.

In furtherance of the Scheme, Hains and Dartez further used the mail, phone, and/or Internet communication devices to disclose trade secrets and confidential information stolen from Total Safety to financial advisors and/or investors to obtain capital to run and operate 24 HR Safety.

119.

In 2010, Dartez and Hains used the phone and/or Internet communication devices to solicit Strickland, Total Safety's former employee, to disclose Total Safety's electronically-stored trade secrets and confidential business information. Strickland provided this stolen information to Defendants, and the information included: confidential rate structures, confidential pricing tools, confidential business strategies, confidential customer information, and confidential quotes (as set forth above in Paragraphs 62-73).

120.

In January 2012, Dartez used the phone and/or Internet communication devices to solicit an unknown Total Safety employee to steal and unlawfully disclose Total Safety's Louisiana-specific customer-by-revenue list, and Hains participated in this wire fraud by encouraging and sanctioning Dartez's conduct. On information and belief, Hains and Dartez then used Total

Safety's confidential business information to open 24 HR Safety's first Louisiana facility in or around May 2012 (as set forth above in Paragraphs 74-80).

121.

From at least September 11 to October 6, 2013, Hains and Dartez conspired to and used the phone and Internet communication devices to solicit and convince Rowland and/or Justin Rowland to use Total Safety's computer network and email exchange to steal Total Safety's confidential business information and to bring that information to 24 HR Safety (as set forth above in Paragraphs 81-102).

**The Pattern of Racketeering Activity And Fraud**

122.

These particular instances of racketeering activity and fraud all relate to the Scheme to steal electronically-stored confidential business information belonging to 24 HR Safety's competitors in order to obtain a competitive advantage over other market participants (as set forth above in Paragraphs 55-106). That is, they are all interrelated and are not isolated occurrences. Though Total Safety was targeted in 2005, again in 2010, again in 2012, and then again in 2013, Defendants utilized the trade secrets and confidential information stolen from Total Safety on a daily basis to operate 24 HR Safety. Additionally, on information and belief, Defendants also targeted other competitors in the interstate marketplace during this same timeframe and utilized confidential business information to operate and obtain a competitive advantage for 24 HR Safety.

123.

This pattern of racketeering activity and fraud continues to pose a threat to Total Safety and other competitors. For instance, Defendants still have Total Safety's confidential business information, and Hains, Dartez, and 24 HR Safety's employees continue to use that information

when conducting 24 HR Safety business. Additionally, Defendants have taken intentional steps to hide and cover-up their racketeering activity and fraud by concealing evidence of their Scheme (as set forth above in Paragraphs 103-106).

**The Ongoing Racketeering Activity And Fraud Has Damaged Total Safety**

124.

As a direct and proximate result of Hains's and Dartez's racketeering activities and violations of 18 U.S.C. § 1962(c), Total Safety has been damaged by having its trade secrets and confidential business information stolen. Total Safety has lost customer sales and other business opportunities. Defendants also have diminished the value of Total Safety's intellectual property and business. Additionally, there is a continuing threat that Defendants will continue possessing and using Total Safety's trade secrets and confidential business information and will continue directing former Total Safety employees to steal, conceal, and provide Total Safety's trade secrets and confidential business information to Hains, Dartez, and 24 HR Safety. Total Safety is thus entitled to all damages caused by Hains and Dartez's violations of 18 U.S.C. 1962(c), treble damages, attorneys' fees and costs, and all equitable relief this Court deems necessary.

125.

Total Safety did not learn, and could not have known about, Hains's and Dartez's misconduct until July 2014, since Defendants intentionally concealed their misconduct from Total Safety until that date.

## COUNT III
## CIVIL RICO—18 U.S.C. § 1962(d)

### (Against All Defendants)

126.

Total Safety realleges and incorporates all allegations set forth herein.

127.

Hains and Dartez (and potentially others) agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, Hains and Dartez knowingly and intentionally furthered the conspiracy to violate 18 U.S.C. § 1962(c), and each committed a predicate act and facilitated others in their commission of predicate acts for the overall purpose of defrauding competitors by stealing, sharing, and using its confidential business information over interstate wires.

128.

The Defendants agreed and conspired to violate 18 U.S.C. § 1962(a). Specifically, Hains, Dartez, and 24 HR Safety knowingly and intentionally furthered the conspiracy to violate 18 U.S.C. § 1962(a)—Hains and Dartez provided 24 HR Safety with income received from the enterprise's pattern of defrauding Total Safety by stealing and using its confidential business information over and through interstate wires, and 24 HR Safety knowingly accepted and reinvested that income in itself to expand its operational reach and market share.

129.

The Defendants conspiracy and the overt acts taken to further the conspiracy have caused damages to Total Safety's business and property.

130.

Total Safety is thus entitled to all damages caused by Defendants' conspiracy, treble damages, attorneys' fees and costs, and all equitable relief this Court deems necessary.

131.

Additionally, Total Safety did not learn, and could not have known, about the Defendants' conspiracy until July 2014, since Defendants intentionally concealed the conspiracy from Total Safety until that date.

## COUNT IV
## MISAPPROPRIATION OF TRADE SECRETS

### (Against Defendants)

132.

Total Safety realleges and incorporates all allegations set forth herein.

133.

Hains and Dartez acknowledged the confidential nature of Total Safety's proprietary business and trade secret information.  As set forth above, Hains and Dartez took Total Safety's confidential business information and trade secrets without authorization shortly before they resigned—which was also a breach of their respective employment agreements. They did this as an agent of 24 HR Safety and provided this confidential business information and these trade secrets to 24 HR Safety. Total Safety expended a substantial amount of time, resources, and expense to develop this information (or paid a substantial sum to acquire the information) and took great care to keep the information confidential.  Haines, Dartez, and 24 HR Safety have used this information in competition with Total Safety to Total Safety's detriment and expense and with the specific purpose and intent of damaging Total Safety.  As a result, Total Safety has been significantly damaged.

134.

Defendants then continued to misappropriate and use Total Safety's confidential business information and trade secrets, including in 2010, 2012, and 2013, through former Total Safety employees, such as Strickland, Rowland, Justin Rowland, and others.

135.

At this stage in the litigation, it is impossible for Total Safety to list all of the trade secrets that were misappropriated. However, 24 HR Safety has produced copies of Total Safety's trade secrets (through forensic examinations required in the Rowland Litigation) that have been on Hains's laptop and external drives since 2005, including but not limited: Total Safety's customer database with over 9,000 customers; Total Safety's 2005 budget and revenue forecast for its Deer Park/La Porte Location, Total Safety's 2001-2004 financial data; Total Safety's 2003 and 2005 capital expenditures; Total Safety's Authorization For Capital Expenditure; several other highly confidential financial data that Total Safety acquired concerning WSI's operations, revenue, and profits; Total Safety's customer strategy; Total Safety's pricing tools; and Total Safety's bid information and rates. Total Safety has also discovered that Justin Rowland had, and failed to return, a flash drive containing several documents comprised of Total Safety's highly confidential business information, such as Total Safety's turnaround schedule and forecasting; Total Safety's pricing tools; customer rates; and other confidential financial data.

136.

Total Safety took reasonable steps to maintain the secrecy of this information by limiting its dissemination and by expressly advising Hains, Dartez, Strickland, Rowland, Justin Rowland and all other relevant Total Safety employees that such information is confidential and not to be disclosed to or used by anyone other than individuals employed by Total Safety. These former Total Safety employees were also obligated to maintain this information's secrecy. Indeed,

Defendants knew that Hains, Dartez, Strickland, Rowland, Justin Rowland, and any other Total Safety employee had confidentiality obligations to Total Safety when the trade secrets were unlawfully obtained.

137.

After improperly obtaining Total Safety's trade secrets, Defendants have retained and used Total Safety's trade secrets to unlawfully compete with Total Safety.

138.

Even though the Defendants knew that the information taken and utilized by them constituted trade secrets belonging to Total Safety and that they were not authorized to possess, disclose, or use those secrets, Defendants misappropriated and used the trade secrets willfully and maliciously.

139.

Defendants continue to possess, and Total Safety faces the threat that Defendants will continue to use the trade secrets for their own benefit and to Total Safety's detriment.

140.

The Defendants' misappropriations of Total Safety's trade secrets are violations of the Louisiana Trade Secrets Act, La. Rev. Stat. §§ 51:1431, *et seq.*—or any other state's trade secret laws that may apply.

141.

Unless restrained by this Court, Defendants will continue these acts of misappropriation and use of trade secrets, causing—as a direct and foreseeable result of their misappropriation of trade secrets—Total Safety to suffer irreparable harm, injuries, and damages, including but not limited to, loss of relevant market share; injury to business relationships; loss of profits and business opportunities.

142.

Total Safety is thus entitled to all damages caused by Defendants' misappropriation of trade secrets, punitive damages, attorneys' fees and costs, and all equitable relief this Court deems necessary.

143.

Additionally, Total Safety did not learn, and could not have known, about the Defendants' misconduct until July 2014, since Defendants intentionally concealed their misconduct from Total Safety until that date.

## COUNT V
## UNFAIR TRADE PRACTICES

### (Against Defendants)

144.

Total Safety realleges and incorporates all allegations set forth herein.

145.

Defendants have engaged in false, misleading, and deceptive acts or practices in their unlawful competition with Total Safety. Hains and Dartez misappropriated Total Safety's trade secrets and confidential business information, breached their fiduciary duties to Total Safety in the course of their efforts to unlawfully compete with Total Safety, and violated the federal Computer Fraud and Abuse Act—and 24 HR Safety used Total Safety's information and benefitted from Hains and Dartez's misconduct.

146.

As a direct and foreseeable result of the unfair trade practices committed by Defendants, Total Safety has suffered irreparable harm, injuries, and damages, and will continue to suffer

irreparable harm, injuries, and damages, including loss of relevant market share, injury to business reputation and goodwill, and attorneys' fees and costs.

147.

The conduct of Defendants described above constitutes unfair trade practices under Louisiana's Unfair Trade Practices Act.  La. Rev. Stat. § 51:1405, and/or similar state laws that may apply. Such conduct involves deception, fraud, breach of fiduciary duties, violations of federal fraud laws, contractual breaches, and other unethical conduct.

148.

All these actions were done to benefit Hains, Dartez, and 24 HR Safety and to harm Total Safety.

149.

Notice of this Complaint has been sent to the Attorney General pursuant to La. R.S. § 51:1409(B).  Therefore, Total Safety is entitled to treble damages under La. R.S. § 51:1409 for any continued violations of the Act.

150.

Total Safety is thus entitled to all damages caused by Defendants' unfair trade practices, treble damages, attorneys' fees and costs, and all equitable relief this Court deems necessary.

151.

Additionally, Total Safety did not learn, and could not have known, about Defendants' unfair trade practices until July 2014, since Defendants intentionally concealed their misconduct from Total Safety until that date.

**COUNT VI**
**CONVERSION/THEFT**

**(Against 24 HR Safety)**

152.

Total Safety realleges and incorporates all allegations set forth herein.

153.

On information and belief, 24 HR Safety is in wrongful possession of property belonging to Total Safety, namely the confidential business information and trade secrets developed by Total Safety.

154.

24 HR Safety took and/or received Total Safety's confidential business information and trade secrets, and/or portable storage devices, and has exercised control over the files containing the information and secrets without Total Safety's authorization.  24 HR Safety asserted ownership over Total Safety's confidential business information and trade secrets and/or portable storage devices by using or intending to use them for their benefit and to Total Safety's detriment.

155.

24 HR Safety has wrongfully excised dominion over Total Safety's property—even after Total Safety demanded its return and cleansing from 24 HR Safety's system—and as a direct and proximate result, Total Safety has suffered damages.

156.

Total Safety is thus entitled to all damages caused by 24 HR Safety's conversion/theft, attorneys' fees and costs, and all equitable relief this Court deems necessary.

157.

Additionally, Total Safety did not learn, and could not have known, about the 24 HR Safety's misconduct until July 2014, since they intentionally concealed the conversions/theft until 24 HR Safety was forced to disclose facts demonstrating the conversions/theft.

## COUNT VII
## CIVIL CONSPIRACY

**(Against Defendants)**

158.

Total Safety realleges and incorporates all allegations set forth herein.

159.

As more fully described above, Defendants conspired to misappropriate and use Total Safety's confidential and proprietary information while Hains and Dartez were still employed with Total Safety. After their resignation, Hains and Dartez used Total Safety's confidential business information to form and build 24 HR Safety into a multimillion dollar company. Throughout 24 HR Safety's existence, Hains and Dartez have regularly accepted and used additional Total Safety confidential and proprietary information in unlawful competition and in violation of the law. Defendants followed their *modus operandi* by seeking to hire and obtain additional Total Safety confidential business information from Strickland in 2010 and an unknown Total Safety employee in 2012.

160.

As the agent of and/or benefit of 24 HR Safety, Rowland intentionally and willfully misappropriated Total Safety's confidential information and trade secrets; intentionally and willfully engaged in unfair trade practices; intentionally and willfully violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4) and (5).

161.

Defendants are solidarily liable for these "intentional and willful" acts.

162.

Total Safety is thus entitled to all damages caused by Defendants' conspiracy, punitive damages, attorneys' fees and costs, and all equitable relief this Court deems necessary.

163.

Additionally, Total Safety did not learn, and could not have known, about the Defendants' collusion and misconduct until July 2014, since Defendants intentionally concealed their collusion and misconduct from Total Safety until that date.

**COUNT VIII**
**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT**

**(Against Hains and Dartez)**

164.

Total Safety re-alleges and incorporates all allegations set forth herein.

165.

As Total Safety employees, Hains and Dartez used company-issued computers to conduct business. They used these company-issued computers for developing and communicating business decisions that affected interstate commerce within the industrial safety industry. Accordingly, the computers qualify as a "protected computer" under 18 U.S.C. § 1030(e).

166.

Shortly before resigning from Total Safety, Hains and Dartez used these computers to obtain Total Safety's confidential business information that they believed would aid them in starting and operating a competing business.

167.

Hains and Dartez did not inform Total Safety that they were using company-issued computers to obtain Total Safety's information that would be used to compete against Total Safety. This omission was intended, since Total Safety would not have given them permission to do so.  Total Safety's employee policies clearly state that this information belongs to Total Safety and that computers should only be used to conduct Total Safety business. Obtaining this information for theirs and 24 HR Safety's use, moreover, violated their respective employment agreements that protected Total Safety's confidential business information. Accordingly, Hains and Dartez intentionally defrauded Total Safety to obtain this information for the Defendants' purposes and gain.

168.

This conduct caused, and continues to cause, injury and damage to Total Safety that far exceeds $5,000.00, including costs associated with responding to Hains's and Dartez's computer fraud and abuse.

169.

Hains and Dartez's fraudulent conduct therefore violated 18 U.S.C. § 1030(4), and the threat of continuing unauthorized access and misappropriation has caused, and will continue to cause, Total Safey to suffer irreparable injury. Total Safety therefore seeks and demands injunctive relief, economic damages, punitive damages, and any other equitable and declaratory relief the Court deems necessary.

170.

Additionally, Total Safety did not learn, and could not have known, about Hains's and Dartez's misconduct until July 2014, since Defendants intentionally concealed the misconduct from Total Safety until that date.

## DEMAND FOR JURY

171.

Total Safety demands a jury trial on all issues triable to a jury.

## RELIEF SOUGHT

172.

Total Safety requests a judgment in its favor, and against 24 HR Safety, Hains, and Dartez, awarding injunctive relief, damages, and all other relief to which Total Safety is entitled in contract, law, and equity, including but not limited to the following relief:

a.      That a mandatory, permanent injunction be issued ordering Defendants to return to Total Safety all property and material that they took belonging to Total Safety, and that they may not maintain or obtain copies thereof, and that they not utilize Total Safety's confidential business information and trade secrets in connection with any business concern;

b.      That monetary damages be entered in favor of Total Safety and against Hains and Dartez for their violations of the Computer Fraud and Abuse Act;

c.      That all Defendants be held solidarily liable for all damages caused by the conspiracy to misappropriate and unlawfully use Total Safety's confidential, proprietary, and/or trade secret information;

d.      That Total Safety be awarded monetary damages for the Hains and Dartez's violations of 18 U.S.C. § 1962(c) and for Defendants' violations of 18 U.S.C. § 1962(a), and that Total Safety be awarded injunctive relief to prevent any further violations of 18 U.S.C. § 1962; and

e.      That Total Safety be awarded all other equitable and judicial relief to which it is entitled, including an award of attorney fees and costs to Total Safety, actual

damages, treble damages, exemplary damages, punitive damages, pre-judgment and post-judgment interest as provided by law and court costs and other taxable expenses as allowed by law.

Respectfully submitted on October 9, 2014.

 */s/ Thomas P. Hubert*
THOMAS P. HUBERT  (LA #19625)
MARK A. CUNNINGHAM (LA #24063)
JOSEPH F. LAVIGNE  (LA #28119)
P.J. KEE  (LA #34860)
*Jones Walker LLP*
201 St. Charles Avenue - 50th Floor
New Orleans, Louisiana  70170-5100
Telephone:  (504) 582-8000
Facsimile:  (504) 582-8015
Email:  thubert@joneswalker.com
Email:  mcunnigham@joneswalker.com
Email:  jlavigne@joneswalker.com
Email:  pkee@joneswalker.com
*COUNSEL FOR PLAINTIFF,*
*TOTAL SAFETY U.S., INC.*

## CERTIFICATE OF SERVICE

I certify that, on October 9, 2014, I electronically filed the foregoing  with the Clerk of Court using the CM/ECF System, and emailed the foregoing to Defendants' Counsel who agreed to accept and waive service under Rule 4 of the Federal Rules of Civil Procedure.

 */s/ Thomas P. Hubert*
THOMAS P. HUBERT